**Alvin W. GOODMAN, Plaintiff,**

v.

**HEITMAN FINANCIAL SERVICES, et al., Defendants.**

**No. 94 C 4381.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 10, 1995.

---

Gilbert Feldman and Robert Seltzer, Cornfield & Feldman, Chicago, IL, for plaintiff.

Don Reuben, Robert Rubin, Victoria Wendling, Altheimer & Gray, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Alvin Goodman ("Goodman") brings this two-count action against Heitman Financial, Ltd. and its wholly-owned subsidiary Heitman Financial Services (collectively "Heitman," treated as a singular noun), alleging age discrimination (Count I) and retaliation (Count II) in violation of the Age Discrimination in Employment Act ("ADEA," 29 U.S.C.

§§ 623(a) and 623(d)).[1] Goodman has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56,[2] both sides have complied with this District Court's General Rule ("GR") 12(m) and 12(n)[3] and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Goodman's motion is denied as to Count I and granted as to liability (but not as to damages) as to Count II.

### Facts [4]

Heitman is a Chicago-based real estate developer with nationwide operations. To assist its executives' frequent travels, Heitman maintains a two-jet five-pilot flight department. Goodman headed the department without complaint for about 10 years beginning in August 1983. Goodman's responsibilities included the safe piloting and maintenance of Heitman's aircraft.

In October 1993 Goodman's relationship with Heitman began to unravel. Early that month he was informed orally by Heitman's Chief Executive Officer Norman Perlmutter ("Perlmutter") that he was being let go and that another Heitman pilot—Eddie Gantner ("Gantner"), age 53—was taking over as chief pilot. Then Goodman received this October 29, 1993 letter from Perlmutter:

Dear Al:

I want to express my appreciation for the fine years of service you have given the Company as Chief Pilot. As happens to all of us, the years go by too quickly; and we find that it is time to start to think in terms of less work and more personal enjoyment.

You have, of course, continued in this position anticipating these last years that you would retire at some time ahead. It is now here. Clearly, with your 70th birthday approaching,[5] it is time for you to retire from this position and turn over the helm to Eddie Gantner.

The Company would like you to officially turn over these responsibilities on November 1 as we discussed. You will remain on the payroll until your 70th birthday, and we would like you to use this time to enjoy a much-deserved vacation.

The Company is awarding you a $50,000 retirement bonus in recognition of the excellent service you have provided us.

We hope that you will be supportive of Eddie in his new role and give him whatever assistance he may require in assuming his responsibilities.

We wish you and Barbara well. I certainly hope that you will continue to consider yourself part of the Heitman family.

Best regards.

Sincerely,

/s/ Norman Perlmutter

That letter forms the crux of Goodman's age discrimination claim against Heitman. On its face it supplies compelling evidence of discriminatory intent—but Heitman offers a rebuttal (which, as n. 2 indicates, must be

---

**1.** Further citations to ADEA's provisions will take the form "Section—," using the Title 29 section numbering rather than ADEA's internal numbering.

**2.** Familiar Rule 56 principles impose on movant Goodman the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant Heitman (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

**3.** Those provisions were designed to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(m) requires each Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each fact alleged. Then GR 12(n) requires each nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of facts and (2) any additional facts that the nonmovant chooses to assert.

**4.** What follows is not a set of this Court's factual findings, but rather a scenario that credits the pro-Heitman evidence with the required reasonable inferences. With limited exceptions confined primarily to the issue of intent, the account therefore generally avoids the awkward and tedious repetition of such qualifying terms as "allegedly" and "Heitman claims" and the like.

**5.** [Footnote by this Court] That date would arrive on January 24, 1994.

credited for present purposes—at least if any rational trier of fact could find it believable). Here it is:

During 1992 and 1993 Perlmutter along with others at Heitman observed a rapid deterioration in Goodman's mental and physical condition, as a result of which Heitman lost confidence in Goodman's abilities as a pilot. Out of respect for his years of valuable service, Heitman decided to craft a letter designed to conceal the real reason for the termination by conjuring up a wholly fictitious and presumably less painful explanation. Thus, in colloquial terms Goodman was told "you're getting old" in lieu of the more hurtful "you're losing it" because Heitman wished to let him down easily.

Heitman argues in the alternative that age is a bona fide occupational qualification ("BFOQ") under Section 623(f)(1) and that it was therefore justified in firing Goodman on that basis. In that respect Heitman relies primarily on the Federal Aviation Commission's "Rule 60" applicable to commercial pilots (though not to private company pilots such as Goodman (14 C.F.R. § 121.383(c)) and upon the expert opinion of Dr. Charles Billings to argue (a) that there are no tests (medical or otherwise) for identifying on an individualized basis which aging pilots can handle the job and (b) that in the interest of safety Heitman was entitled to use age as a proxy for ability.

In March 1994 Goodman met with Perlmutter and Heitman's Chief Financial Officer and Executive Vice President Roger Smith ("Smith"). Goodman was concerned that under Perlmutter's October 1993 letter his wife would lose her health insurance eight months short of her 65th birthday, when she would become eligible for Medicare. Perlmutter agreed to put Goodman back on the Heitman payroll for one year as a "reserve pilot" (a makeshift position with no responsibilities) and to recharacterize the $50,000 retirement bonus as salary to be paid out over the year to a company that Goodman would set up. That arrangement paralleled a January 16, 1994 written request that Goodman had made of Heitman personnel officer Marge Reich ("Reich") that his retirement bonus be paid to "Alvin Goodman Associates." Good-man's only contact with Heitman after the March 1994 meeting was to discuss his wife's health insurance with Reich.

On May 3, 1994 Goodman lodged an age discrimination charge against Heitman with Equal Employment Opportunity Commission ("EEOC"). On July 14, 1994 Heitman filed a nine-page position statement with EEOC, raising only a BFOQ defense. Nothing in that document referred to Goodman's deteriorating condition or to Heitman's desire to avoid bruising his feelings by referring to his age as a mask for its real reason in terminating him.

On July 19 Goodman filed the Complaint in this action alleging age discrimination via the October 1993 termination (Count I). Some five weeks later Goodman's lawyer received this August 26, 1994 letter from Heitman's lawyer:

> Re: *Alvin W. Goodman v. Heitman Financial Services and Heitman Financial, Ltd. (Defendants collectively referred to as "Heitman"). Case No. 94 C 4381*
>
> Dear Mr. Feldman:
>
> In light of Mr. Goodman's federal court action against Heitman, it is necessary to state the obvious in writing. By reason of Mr. Goodman's failure to exercise his request for additional employment in lieu of a retirement bonus, any and all rights previously extended by Heitman were rejected by Mr. Goodman. Even if Mr. Goodman had decided to exercise any of these rights, in light of the federal court action Heitman would have withdrawn their previous offer.
>
> If you have any questions concerning this matter, please feel free to call me.
>
> Very truly yours,
>
> /s/ Robert J. Rubin

That prompted Goodman to amend the Complaint by adding a claim for retaliatory discharge (Count II). On its face the August 1994 correspondence (like its October 1993 cousin) provides compelling evidence of retaliatory intent. Again Heitman seeks to rebut that charge by proffering an alternative explanation—this time, a purported explanation that does not even find its way into their

memorandum as an argument (see n. 8). Instead the "factual" presentation at Heitman Mem. 13 somehow attempts to convert the second sentence of the August 1994 letter into an assertion (not made there, and really not even implied there) that after the March 1994 meeting Goodman had failed to supply Heitman with the federal tax identification number ("TIN") for his company, as a result of which Heitman formed the belief that Goodman had rejected their agreement. More on this subject later.

Goodman currently flies under the name of an unincorporated sole proprietorship called "Alvin Goodman Aviation Enterprise." Under that rubric he has flown part-time for another carrier since January 1994 at $250 per day, providing gross income of some $31,000 in 1994. Goodman has not received any part of the $50,000 promised by Heitman, either as retirement bonus or as salary.

### Age Discrimination (Count I)

■ Section 623(a)(1) forbids an employer from firing or refusing to hire or "otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age." While the statute originally limited such protection to workers between the ages of 40 and 65, a series of amendments uncapped the ADEA so that there is now no bright-line upper age limit (Section 631). Goodman alleges in Count I that Heitman violated Section 623(a)(1)'s prohibition against age discrimination by terminating him because he turned 70. To prevail by way of summary judgment Goodman must show that no reasonable jury could conclude otherwise.

Goodman Mem. 3–5 reflects that he has taken the road less travelled by seeking to prove discrimination directly, without use of the familiar burden-shifting formula set out originally for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and since applied to ADEA claims (see, e.g., *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375,

377–78 (7th Cir.1995) and cases cited there).[6] Given the often subtle and elusive aspects of age discrimination (*La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1409–10 (7th Cir.1984); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898–99 (3d Cir.1987) (en banc)), the ever-increasing legal sophistication of many employers (Ann McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases*, 34 B.C.L.Rev. 203, 215 n. 45 (1993)) and the inherent difficulties in any attempt to establish someone else's state of mind (*United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716–17, 103 S.Ct. 1478, 1482–83, 75 L.Ed.2d 403 (1983); *Chipollini*, 814 F.2d at 899), it is not surprising that courts see less and less direct evidence of discriminatory intent as the years tick by.

Nevertheless the route clearly remains open (*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir.1992); *La Montagne*, 750 F.2d at 1409–10; Charles Sullivan & Michael Zimmer, *Proving a Violation under the Age Discrimination in Employment Act of 1967*, 17 Seton Hall L.Rev. 803, 810–11 (1987)). Direct evidence has surfaced for example in an interviewer's notes reflecting that a job applicant was considered "too old" for a position (*Hodgson v. First Fed. Sav. & Loan Ass'n*, 455 F.2d 818, 821 (5th Cir.1972)), in a supervisor's characterization of an employer's hiring practices as a "youth movement" (*Schulz v. Hickok Mfg. Co.*, 358 F.Supp. 1208, 1212 (N.D.Ga.1973)) and in a letter to an aging faculty member denying tenure that included as one of its reasons recent federal legislation invalidating the school's mandatory retirement policy (*Puppel v. Illinois Benedictine College*, 731 F.Supp. 310, 311 (N.D.Ill. 1990)). For other examples both real and posited, see *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433–34 (4th Cir.1985); *Jackson v. Shell Oil Co.*, 702 F.2d 197, 199, 201 (9th Cir.1983); *Hagelthorn v. Kennecott Corp.*,

---

**6.** Goodman R.Mem. 6 n. 4 reconfirms his sole reliance on the direct method of proof, characterizing Heitman's excursion into the indirect method "under a *McDonnell Douglas* analysis [as] quite superfluous under the facts of this case."

710 F.2d 76, 78, 80 (2d Cir.1983); *Stanojev v. Ebasco Servs. Inc.,* 643 F.2d 914, 921 (2d Cir.1981).

What is involved in those terms here is a pitting of the plain language of the October 1993 termination letter against the explanation that is now provided by Heitman. For Rule 56 purposes the question boils down to this: In light of the letter's several explicit references to age (particularly the unequivocal "Clearly, with your 70th birthday approaching, it is time for you to retire"), could a reasonable jury believe testimony from Perlmutter and perhaps others (a) that the real reason for the decision was a loss in confidence in Goodman's abilities as a pilot resulting from an observed physical and mental decline and (b) that the October 1993 letter was designed to let Goodman down gently by making him think that he was being fired on account of age when the real reason was his rapidly deteriorating condition?

That explanation may be nothing more than a contrived cover story, but in the present posture of the case that decision must be made by a trier of fact—not by this Court as a matter of law. After all, the letter itself may have been a cover story of a different type. Modern life is full of little white lies designed to appease the listener and to skirt conflict. Without being overly cynical, it seems fair to say that it would be difficult to imagine a world without measured doses of deception of that nature.

In Rule 56 terms it is enough to say that a reasonable jury could credit Heitman's explanation, and that suffices to defeat Goodman's motion for summary judgment as to Count I. To be sure, Heitman's chosen defense creates some obvious credibility problems of its own: If Perlmutter admits to having lied to Goodman for his supposed benefit, how is the jury to know that Perlmutter is not lying to them to protect his (and hence Heitman's) own interests? And if the real reason for terminating Goodman was his performance and not his age, what explains the fact that when the purported desire to avoid bruising Goodman's feelings was no longer operative—after he had already filed discrimination charges with EEOC—nothing contained in the detailed position paper that his lawyers filed with EEOC, and even later nothing contained in the three versions of Answers and Amended Answers containing affirmative defenses ("ADs") that Heitman filed in this action,[7] contained a single reference to that claimed reason? But the short answer for now is that Heitman has preserved the right to address those along with many other questions at trial.

Because Count I must indeed go to trial, this opinion goes on to treat with Heitman's ADs to that claim. One of those defenses (Heitman's BFOQ claim) occupied by far the major portion of Goodman's two memoranda on the current motion and a significant (though by no means dominant) part of Heitman's memorandum, while the others were touched on only fleetingly or not at all in the course of the parties' briefing.

■ As for the BFOQ issue, the parties' extended preoccupation with that subject has proved to be quite needless. Without question it must be recognized as a total afterthought (and indeed a lawyer's, not a client's, afterthought) in this case. Wholly unlike the situation in such cases as *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) and *Monroe v. United Air Lines, Inc.,* 736 F.2d 394 (7th Cir.1984), where airlines confronted with the need to deal with large numbers of their flight personnel (those not governed by the FAA's Age 60 Rule) determined up front that in their view it was impossible or impracticable to screen out those personnel over a specified age who could not do the job, in this instance Heitman expressly claims that it made precisely that individualized decision as to Good-

---

7. One of the ADs—AD 3, dealt with a bit later— did advert to Heitman's having learned about claimed problems with Goodman's performance *after* he was terminated (a contention that antedated the Supreme Court's decision dealing with such after-acquired evidence in *McKennon v. Nashville Banner Publishing Co.,* —— U.S. ——,

115 S.Ct. 879, 130 L.Ed.2d 852 (1995)). But if anything the assertion of that defense creates a strong negative inference as to Heitman's current assertion that such deficiencies were known to it before it terminated Goodman and were the motivating factor in its decision to do so.

man. And that claim has been elaborated upon at length and in detail in order that Perlmutter and Heitman can get out from under the otherwise damning statements in Perlmutter's October 29, 1993 letter.

There is a good deal to be said in such circumstances for the application of the approach that in a number of other legal contexts has been spoken of as the "mend the hold" doctrine (see, e.g., *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–63 (7th Cir.1990) and the affirmance of one of this Court's decisions in *qad.inc. v. ALN Associates, Inc.*, 974 F.2d 834, 839 (7th Cir. 1992)): Having taken a position as to its *intent* in terminating Goodman and as to its *intent* in referring to his age as a mere cover story for its true intent (intent being a critical element in an employment discrimination case), Heitman cannot then shift ground to say that its intent was rather to apply a BFOQ—to use age as an arbitrary surrogate for a decision that it believed it could not make as to Goodman's actual ability to carry out his responsibilities as a pilot.

In all events Heitman cannot here maintain its hindsight BFOQ contention, which emerged only when—well after it had terminated Goodman for other asserted reasons and after Goodman had gone to EEOC with his age-discrimination charge—the problem was placed in its lawyers' hands to draft a position paper. Again it is underscored that the claimed BFOQ rationale is entirely at odds with what its decisionmaker Perlmutter has *sworn* was his real reason for the termination. In the form in which Heitman has advanced that BFOQ defense—as a claimed defense to its liability under Count I—that AD 1 is dismissed.

■ Heitman's other ADs may be addressed in brief compass. AD 2 asserts that

Goodman did not do enough to mitigate his damages—something that plainly raises questions of fact to be dealt with at trial. AD 3 says that Goodman is not entitled to relief because of after-acquired evidence of inadequate job performance, an issue that under *McKennon* may go to damages and therefore may also be posed at trial. AD 4, asserting accord and satisfaction, fails under the Section 626(f) limitation on waivers of rights under the ADEA: Goodman entered into no written agreement in the form designated there, and so he did not waive his right to recover under the statute. Finally, AD 5 involves an alleged set-off to damages and, like the other damage arguments, must be resolved at trial.

In sum, Heitman's ADs 1 and 4 are dismissed. Its ADs 2, 3 and 5 survive for resolution at the trial of Goodman's Count I claim.

### Retaliation (Count II)

■ Section 623(d) forbids an employer from retaliating against an employee for reasons stemming from the employer's alleged age discrimination (more precisely, the employer may not "discriminat[e] against [an] employee[ ] ... because [he or she] has opposed any practice made unlawful by [Section 623], or because [he or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [ADEA]"). It will be remembered that less than 45 days after Goodman launched this action charging Heitman with age discrimination, Heitman backed out of its $50,000 obligation under the March 1994 agreement. Again, to prevail by way of summary judgment Goodman must show that no reasonable jury could view that action as other than retaliatory.[8]

---

**8.** What follows in the text gives Heitman far more than its due, for the total poverty of the only arguments that it proffers in opposition to Count II (occupying just two pages of its 39–page memorandum) gives perhaps the best clue to the absence of merit in that opposition:

    1. Heitman Mem. 37 advances the absurd contention that "As Heitman Did Not Reemploy Goodman, It Could Not Have Unlawfully Terminated Him"—as though it would be perfectly in order under Section 623(d) for Heit-

man to welsh on its commitment "to pay Goodman's retirement bonus in the form of a year's salary" (*id.*) as a retaliatory measure for Goodman's having had the nerve to sue it.

    2. Heitman Mem. 38 asserts with equal inattention to the applicable law that "Heitman Did Not Terminate Its Agreement With Goodman Because Of His Age"—as though that were the statutory criterion, rather than the actual one that prohibits retaliation for the exercise of ADEA rights.

Once more Goodman Mem. 5–6 eschews the *McDonnell Douglas* framework in favor of a direct approach to proving retaliation. Both methods are of course applicable to Section 623(d), though the indirect route is most often traveled (see, e.g., *Brenner v. Brown*, 36 F.3d 18, 19 (7th Cir.1994) (per curiam); *Rennie v. Dalton*, 3 F.3d 1100, 1108–09 (7th Cir.1993)) for the obvious reason that employers so seldom *say* that they are engaged in retaliatory conduct. And so once more it becomes necessary to delve into Heitman's collective mind. This time that requires a look at what Heitman now says motivated the August 1994 letter in which its lawyer disavowed its obligation.

By way of recapitulation, it will be recalled that Heitman suggests in its purported factual submission (but without *any* reference to evidentiary support, and without even addressing the subject in its legal memorandum) that it issued that letter because Goodman had failed to provide it with the TIN for his company. Heitman says in its "factual" submission, again without any attempt at evidentiary support, that without that information it was incapable of completing the paperwork needed to return Goodman to the payroll and to pay his retirement bonus as salary. That argument could well be dispatched because of its procedural insufficiency under Rule 56 and GR 12(n). But out of a superabundance of caution and because the matter may bear on Heitman's credibility as such, this opinion will look at the argument's merit (or in this instance its lack of merit).

Even a cursory examination of the tax laws and regulations reveals the suspect nature of Heitman's explanation. Under certain circumstances an employer is required to secure an employee's TIN and to include that number in returns, statements and other filings (26 C.F.R. § 301.6109–1(c)). Any employer who does not have an employee's TIN must request that information from the employee (*id.*), for which purpose the IRS has prepared its Form W–9.

Form W–9's instructions specify what information the employee is to provide: Any individual must turn over his or her Social Security Number ("SSN"), any corporation or partnership must apply for and receive a special TIN called an Employer Identification Number ("EIN") and report that number, and any sole proprietor has the option of providing either its EIN or the individual owner's SSN. IRS regulations set out what an employer is to do if a request for the required information fails to bear fruit: In that event the required filing is still made, accompanied by a signed affidavit describing the efforts made to secure the missing TIN (26 C.F.R. § 301.6109–1(c)). Related provisions instruct the employer on how to handle withholding and other matters (see 26 U.S.C. §§ 3405(d)(12) and 3406(a)(1)(A)).

Heitman's purported cover story must be viewed as pretextual. For one thing, some degree of stretch is involved in Heitman's assertion that it didn't already have Goodman's TIN. Unless Goodman's company was in corporate form, his TIN would be his already-existing SSN, and Heitman had to have had that number on file because Goodman had been its employee. Remember that before the March 1994 meeting Goodman had written Reich in his cordial January 16, 1994 memo:

> I have formed a company, Alvin Goodman Associates, to provide Aircraft Consulting and Pilot Services.

And remember, as any lawyer knows, that the name that Goodman had then given to Heitman (lacking any corporate indicia) negated the existence of a corporation—indeed, it suggested instead the use of the sole proprietorship that is in fact Goodman's vehicle for doing business.

It is true that Goodman has responded to two deposition questions about the March 1994 meeting in this fashion (Goodman Dep. 43):

> Q. Did you ever tell Mr. Perlmutter or Mr. Smith on the 16th that you were going

Maybe the advancement of those contentions, which clearly do not pass the straight-face test employed by this Court's former colleague Susan Getzendanner ("No lawyer should ever make an argument that can't be made with a straight face"), could alone be viewed as a signal calling for Goodman to win his Count II Rule 56 motion as though by default. Nonetheless this opinion goes on to demonstrate why Heitman had to lean on such weak (or even nonexistent) reeds.

to incorporate an entity in order to receive the compensation that was discussed on the 16th?

A. Yes, I talked about it.

Q. What did you say to Mr. Smith and/or Mr. Perlmutter concerning that subject matter?

A. I told Mr. Smith that I was going to form a little company, which I did, and wanted the money, if it came, to be paid to the company.

In that regard, it is hardly clear that Goodman was there making (or recognizing) the legal distinction between incorporated and unincorporated businesses, given his "which I did" statement and the uncontroverted fact that the "company" that he is actually operating is a sole proprietorship and *not* a corporation. But in light of the inference-drawing rules on Rule 56 motions, Heitman will be given the benefit of the doubt in that respect.

What is more relevant is the already-mentioned fact that Heitman does not claim to have made any request for Goodman's EIN (as it normally would have done if he failed to apprise it of information that it viewed as essential to its implementation of the revised deal that they had struck). That, coupled with the fact that the tax laws allowed Heitman to process Goodman's papers and comply with IRS reporting requirements by affidavit, certainly supports the inference that Heitman's current story has been cooked up in an effort to stave off liability.

■ But there is more, stemming from Heitman's own August 1994 letter in which it first aired that story. Before those factors based on the letter itself are discussed, it is worth noting the short time span that elapsed between Goodman's protected activity and Heitman's adverse action. That time relation can provide indirect evidence of retaliatory intent (see, e.g., *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42–43 (5th Cir.1992) and *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.1986); and contrast *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1115 (7th Cir.1992) and *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110–11 (1st Cir.1988)). If this Court were being called on to evaluate the relative merits of the litigants' positions, the inference of a causal link between the filing of this action and Heitman's writing of its termination letter the very next month would have to be viewed as pretty strong. And the same time sequence substantially buttresses the already substantial inference that Heitman is offering a bogus explanation—note that Heitman did not suggest that Goodman's claimed failure to provide an EIN was a ground for complaint, let alone for the termination of the parties' agreement, during the entire four months that passed between the March 1994 meeting and Goodman's July 1994 filing of this lawsuit, but that the claimed delinquency then suddenly became the predicate for Heitman's backing out of its obligation within the following five weeks (*after* this suit had been filed).

But of course weighing the evidence is not this Court's role on the current motion, so it turns to the internal language of the August 1994 letter itself, which provides compelling direct evidence of Heitman's retaliatory intent. That begins right off with the letter's statement of its subject matter, which Heitman's lawyer labeled this way:

Re: Alvin W. Goodman v. Heitman Financial Services and Heitman Financial, Ltd. (Defendants collectively referred to as "Heitman"), Case No. 94 C 4381).

It is hard to imagine a more candid linkage between Goodman's then recent filing of his lawsuit and Heitman's response backing out of its contractual commitment, for "Re:" expressly signals the purpose or topic of correspondence (note that the letter does *not* begin, for example, "Re: Alvin W. Goodman Tax Identification Number"). Though Heitman's litigation counsel may now wish that he had been less open about it, the letter's own self-designation conveys the message, "You filed suit, and as a result we are taking the action described below."

That reading is directly buttressed by the letter's first full sentence:

In light of Mr. Goodman's federal court action against Heitman, it is necessary to state the obvious.

Nor is any other reading conveyed by the somewhat confusing second sentence:

By reason of Mr. Goodman's failure to exercise his request for additional employment in lieu of a retirement bonus, any and all rights previously extended by Heitman were rejected by Mr. Goodman.

That language suggests that because Goodman had done X or had failed to do Y, Heitman somehow formed the belief that he had rejected the terms of the March 1994 agreement. But what are X and Y? According to Heitman itself, it never intended to ask its reserve pilot to fly or to do anything else for the company. Rather it is undisputed by the parties that the position was a sinecure created to ensure that Goodman's wife continued to receive health care coverage. Goodman was *supposed* to do nothing.

But the real clincher is in the letter's third and final sentence, which renders Goodman's mystery "breach" immaterial. It says:

Even if Mr. Goodman had decided to exercise any of these rights, in light of the federal court action Heitman would have withdrawn their previous order.

That is, even if Goodman had done X or not failed to do Y, Heitman would have backed out of its agreement "in light of the federal court action." That really leaves no room to take Heitman at anything other than its word: Its motivation for the August 1994 letter was the Complaint that Goodman had filed a month earlier.

In sum, that confessed motivation in conjunction with the other parts of that letter and with the short time lapse between the commencement of suit and Heitman's adverse action (even leaving aside the serious doubts as to the credibility of Heitman's non-discriminatory explanation) compels summary judgment in Goodman's favor as to Count II. It is of course conventional wisdom that the need to inquire into the defendant's state of mind frequently renders employment discrimination cases unsuitable for summary disposition (10A Charles Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2732.2,

at 340 and cases cited at 340–62 (2d ed. 1983))—a concept most often articulated in rejecting employer defendants' Rule 56 motions in such cases. But that generality does not at all contraindicate the granting of summary judgment where the record supports it (see, e.g., *Shager v. Upjohn Co.*, 913 F.2d 398, 399 (7th Cir.1990); *Lubeck v. Comet Die & Engraving Co.*, 848 F.Supp. 783, 784 (N.D.Ill.1994))—and the evidence in this case justifies such a result.

### Conclusion

There are genuine issues of material fact that foreclose a determination as a matter of law that Heitman discriminated against Goodman on account of his age in October 1993, and so Goodman's motion for summary judgment as to Count I is denied. But no such factual issues stand in the way of Goodman's other claim, and he is entitled to a judgment as a matter of law (a summary judgment as to liability, for the parties have not addressed the issue of damages) that Heitman retaliated against Goodman in August 1994 for his having filed this age discrimination lawsuit.[9]

What comes next, then, is the establishment of the procedures necessary to bring this action into a state of readiness for trial. This Court sets the next status hearing at 8:45 a.m. August 18, 1995 to discuss those next steps.

---

**9.** Although the trial as to Count II will thus be limited to the subject of Goodman's damages, it would seem that this opinion's holding as to the pretextual nature of Heitman's purported cover story as to that claim will be admissible for the

jury's consideration in resolving Heitman's credibility and the bona fides of its story as to Goodman's Count I claim. No definitive ruling to that effect is made here, but that subject may also be dealt with at the next status hearing.