Nicole DAMATO, Plaintiff,

v.

JACK PHELAN CHEVROLET GEO, INC., and Robert Frith, Employee and Agent, Defendants.

No. 95 C 3595.

United States District Court, N.D. Illinois, Eastern Division.

May 17, 1996.

William Jerome Juneau, Lavelle, Juneau & McCollom, Ltd., Oak Park, IL for plaintiff.

Linda Kay Horras, Tom H. Luetkemeyer, Hinshaw & Culbertson, Chicago, IL, for defendants.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is Defendants' Motion for Summary Judgment on various counts of Plaintiff's Amended Complaint. For the following reasons, the motion is granted in part and denied in part.

### I. *Background* [1]

Nicole Damato ("Damato") worked for Defendant Jack Phelan Chevrolet Geo ("dealership") for approximately three months in 1994. Following her alleged constructive discharge from the dealership, she filed the instant Amended Complaint ("Complaint") against the dealership and Robert Frith ("Frith"), her former immediate supervisor. The Complaint contained the following allegations: sexual harassment, national origin discrimination, and retaliation against the dealership only (Counts I, II, and III respectively); and battery and hate crime against both defendants (Counts IV and V). Defendants now move for partial summary with respect to Counts III, IV, and V of the Complaint.

John Phelan ("Phelan") owns one-hundred percent of the dealership's stock. Phelan and his wife are the only two officers and directors of the dealership. Phelan functions as the general manager of the dealership and is closely involved with its operation.

---

**1.** The following facts are taken from the parties' Local Rule 12 statements of facts.

Directly under Phelan are seven "line managers" ("managers"), who supervise various departments within the dealership. The managers are responsible for overseeing operations and staff within their respective departments. Phelan claims that these managers "do not have independent authority to set policy, goals or objectives."

Frith was one such manager, in charge of operations and staff in the service department. Frith had worked for the dealership since the 1980s. Some of his duties included supervising employees in the department, overseeing department work flow, ensuring efficiency, and "troubleshooting" problems as they arose.

Like other managers, Frith possessed the authority to hire employees for his department, as well as the authority to discipline or terminate those employees for serious misconduct. If the misconduct was not "serious," Frith had the authority to investigate the conduct and make a recommendation to Phelan as to the appropriate discipline.

Phelan contends that Frith did not have authority to set policy or make management decisions. Damato, in her affidavit, disagrees to the extent that Frith, as a manager, set internal rules under which his department operated. Damato contends that Frith both hired and fired her.

Phelan's affidavit states that he alone has exclusive authority over the dealership's labor relations. For example, Phelan states that he entered collective bargaining agreements and set personnel policies. Nothing in the submissions indicates that collective bargaining provisions apply to Damato. With input from the managers, Phelan also determined staffing needs. Phelan delegated authority to the managers to discipline and discharge employees for serious misconduct. Examples of such misconduct include property damage, fighting, and insubordination. For other cases of misconduct, the managers consulted with Phelan, the "final authority" on discipline, both before and including the time of discharge. For example, states Phelan, Phelan determines whether sexual harassment complaints are well-founded and the appropriate discipline for any such harassment. However, there is no evidence of a written corporate plan or policy regarding sexual harassment.

Damato alleges that, in September 1994, Frith contacted Damato, inviting her to apply for an open cashier position at the dealership. Frith became acquainted with Damato through her work with a company with which the dealership contracted. Damato applied and was promptly hired by Frith. The prior relationship is not extensively developed in the submissions.

During her work as a cashier, which involved receiving payments from service department customers, Damato spoke with Frith approximately ten times per day. Most of their conversations occurred in Frith's private office, in Damato's office at her desk, or on the telephone. Damato's office was a short distance from Frith's.

Damato states that Frith's misconduct began during Damato's interview, when Frith complemented her for "looking good" and having "nice legs." The record does not disclose what Damato said in response. However, she took the cashier's job. Damato alleges that, after a few weeks on the job, Frith sought familiarity with Damato by commending her for her "nice butt," "nice breasts" and "nice ass." Damato states that Frith later referred to her as "Honey," "Sweetie," "Sweetheart," or "Babe" in virtually every conversation. Damato says that she continually rebuffed Frith's comments and requested that he call her by her name. She did not complain to Phelan.

Further, Damato alleges that Frith's attention began to include unwelcome physical conduct. She states that he placed his hands on her shoulders, waist, and buttocks. Also, Damato says, there were occasions when Frith would back into Damato, pinning her against a wall and rubbing his body sensually against her. She did not complain to Phelan.

In October 1994, while Damato was standing on a chair hanging Halloween decorations, Damato says that Frith surprised her from behind and began rubbing her legs. When she objected, Damato continues, Frith laughed. Still, she did not complain to Phelan.

Frequently, continues Damato, Frith told Damato that he knew that she "put out" because she was a single mother. Damato says that Frith asked her to go "cage dancing" at a nightclub, and that she declined.

Damato says that Frith's sexual harassment was mixed with offensive name-calling of Damato, who is of Italian descent. She states that he would call her "Dago" and "Wop," describing that all Italians as "thieves or mobsters." How the name-calling would advance any of Frith's perceived sexual intentions is not clear in the submissions.

Damato states that, on numerous occasions, she complained to Frith about his unwelcome conduct. Damato states that, in response, Frith laughed and continued the offensive behavior. Damato says that when she threatened to report Frith to Phelan, Frith's only supervisor, Frith stated that he would have her fired if she did. Despite Frith's persistence, Damato says that she refused to acquiesce.

Damato did not report Frith's sexually harassing behavior to Phelan or anyone else at the dealership except Frith. She states that she feared retaliation by Frith, and that she needed her job to support her child. In her affidavit, Damato states that she did, however, make repeated complaints of Frith's behavior to her parents. The parents did not complain to Phelan.

Generally, Damato states that Frith sexually harassed her and made comments about her national origin when no one else was present. She cannot say for certain whether anyone overheard Frith's comments or witnessed Frith touching her. On one occasion, Maritza Hernandez, Damato's co-worker, may have witnessed some of the alleged harassment. Phelan states that he did not observe, nor was he informed of, Frith's alleged conduct. Certainly, Frith did not tell him about it. Phelan states that no other employee has ever complained of sexual harassment or discrimination by Frith.

Damato says that, in December 1994, four months after he hired her, Frith retaliated against her by ordering her to resign and requesting her to sign a letter of resignation prepared by Frith. According to Damato,

the resignation provided that she would leave the company in two weeks. However, Damato also says that several days later the cashier's book did not balance and Frith accused her of stealing $83.

At this point, Damato's affidavit differs from her deposition testimony. At her deposition, Damato stated that Frith accused her of stealing two days before her two week notice period expired and that she left two days later. Her affidavit states that the accusation occurred three days after she signed the purported resignation and that she left one day later. Defendants state that they have never seen the alleged resignation and argue that it does not exist.

■ This conflicting testimony might ordinarily demonstrate a fact question in this case. However, regarding the timing of her leaving her cashier position, the court accepts the sworn testimony of Damato at her deposition and rejects the statement made in her later submitted affidavit. As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony. *Russell v. Acme–Evans Company,* 51 F.3d 64, 67–68 (7th Cir.1995); *cf. Adelman–Tremblay v. Jewel Companies, Inc.,* 859 F.2d 517, 520–21 (7th Cir.1988) (contradictory affidavit containing newly-discovered evidence is an exception). As to the existence of the "resignation letter" to which Damato has referred, none has been produced.

Damato states that, at the time Frith allegedly forced her to resign, Frith told Damato that the stealing was typical of "wops and dagos." Damato denied the charges, left the premises, and did not return. Defendants argue that, in reality, Damato voluntarily resigned verbally and gave her two weeks notice. Defendants assert that Damato told Frith that she intended to open her own body shop with a partner. Defendants produce the affidavit of Maritza Hernandez, who swears that Damato told Hernandez of the new body shop, and that Damato had herself given two weeks notice. At her deposition, Damato testified that she told people at the dealership about her dream of opening her own body shop.

## II.  *Discussion*

To defeat a motion for summary judgment, the non-movant must marshal evidentiary facts sufficient to raise a genuine issue of material fact.  Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment shall be rendered where the pleadings, depositions, and admissions of record, together with any affidavits, demonstrate there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When two individuals give contradictory accounts of a situation of which they have personal knowledge, and both accounts are plausible, the decision as to which is correct must await trial before the factfinder; "summary judgment is not a procedure for resolving a swearing contest."  *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir.1992).  *See also Wilson v. Williams,* 997 F.2d 348, 350 (7th Cir.1993) (reversing grant of summary judgment which turned on credibility determinations).

### A.  Retaliation

To establish claims for retaliation, plaintiffs must show (1) that they engaged in statutorily protected activity, (2) that they suffered adverse employment action, and (3) that there is a causal link between the protected activity and the adverse action.  *Rennie v. Dalton,* 3 F.3d 1100, 1109 (7th Cir. 1993).  Damato argues (1) that her complaints to Frith were statutorily protected activity, (2) that she suffered adverse employment action when she was constructively terminated because of her refusal to acquiesce to Frith's harassment, and (3) that there is a causal link between the protected expression and the termination.

Regarding the first element of Damato's retaliation claim, the dealership asserts that Damato was not engaged in protected activity because she never reported the harassment to Phelan.  Retaliation necessarily assumes knowledge of the predicate protected activity.  An employer cannot retaliate for something of which does not know.  *Cue-*

*vas v. Monroe Street City Club, Inc.,* 752 F.Supp. 1405, 1412 (N.D.Ill.1990) (stating that where an employer making an adverse employment decision does not know that the employee is asserting a protected right, there is no causal link).  If decisionmakers are not aware of protected activity, such activity cannot be a cause or motive for discharge.  *Vandeventer v. Wabash Nat. Corp.,* 893 F.Supp. 827 (N.D.Ind.1995).

However, Damato stated under oath that she complained to Frith, her supervisor, and Phelan admits that Frith was a decisionmaker.  Phelan states that Frith had the authority to hire employees, fire employees under some circumstances, and to recommend firing of employees in all other circumstances.  Informal complaints to supervisors can constitute protected activity.  *Maldonado v. Metra,* 743 F.Supp. 563, 568 (N.D.Ill. 1990).  Moreover, Damato need not have been correct in her belief that Frith's conduct was unlawful; Damato must only have had a reasonable belief that she was challenging conduct which violated Title VII. *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1314 (7th Cir.1989).

Even where torts occur outside the scope of employment, a master is liable for the torts of its servant when the servant purported to act or speak on behalf of the principal and another relied upon apparent authority, or the agency relationship aided the servant in accomplishing the tort.  *Jansen v. Packaging Corp. of America,* 895 F.Supp. 1053, 1066 (N.D.Ill.1995).  When someone at a decision-making level within a corporation abuses authority by committing a wrong in furtherance of the corporation's business, that wrong is treated as corporation's deliberate act.  *Id.*  In order for a corporation to be liable for its supervisor's sexual harassment, it is not enough that the supervisor's position allowed him to be present to harass the employee; he must also have called upon some aspect of his apparent authority to facilitate his harassment.  *Id.*

In the instant case, Damato alleges that Frith would have had her fired (not that he

would fire her) if she complained. According to Damato, Frith did so.[2]

■ Since Frith was Damato's supervisor, with authority from the dealership to hire and fire her, and Damato repeatedly complained to Frith, the court infers that Damato may have reasonably believed that she was challenging Frith's behavior. As such, Damato has adequately demonstrated that she was engaging in protected activity. Threatening to fire or to have one fired both serve to chill or eliminate complaints. The court is not persuaded by employers, like the dealership, who delegate authority and later deny liability for its alleged abuse simply because that abuse occurs behind closed doors.

Frith was a decisionmaker. The dealership does not contest Frith's knowledge of Damato's complaints to him. Damato has established the first element of a retaliation claim against the dealership.

■ As to the second element of Damato's retaliation claim, adverse employment action, Defendants' reply notes that the Complaint alleges "discharge" rather than "constructive discharge." Given liberal notice pleading requirements, the court does not find this inconsistency fatal. *See Bartholet v. Reishauer A.G.,* 953 F.2d 1073, 1078 (7th Cir.1992) (stating that a plaintiff need not specify the correct legal theory of recovery in its complaint).

■ Constructive discharge does constitute adverse employment action. *Zorn v. Helene Curtis, Inc.,* 903 F.Supp. 1226, 1249 (N.D.Ill.1995). *See also Cain v. Larson,* 879 F.2d 1424, 1427 (7th Cir.1989) ("Of course, if we were confronted with a case in which an officer had been so harassed in retaliation for her exercise of rights ... that she resigned, then it would be possible to make a 'constructive discharge' argument."). The parties engage in a "swearing match" regarding the events surrounding Damato's departure from the dealership. Neither party produces documentation or outside witnesses to those events. This absence of witnesses is consistent with Damato's contentions. The absence of documentation (i.e., the purported forced resignation) is also consistent with her contentions, as any documents would likely be in the control of the dealership. If the existence of the document is established, the failure to produce it may support a negative inference. This issue must be resolved by fact finders weighing the credibility of the witnesses.

As to the third element of a retaliation claim, causation, a genuine issue of material fact exists as well. Damato argues that Frith made her work environment impossible to withstand because she would not acquiesce to his advances. Further, she swears that, when she complained to and threatened to report Frith, her supervisor, he threatened to have her fired, as Phelan concedes he could have done. After her complaints, Damato alleges that her work environment

---

**2.** The dealership does not contend that Damato unreasonably believed Frith's threat to have her fired for reporting the harassment. As such, at summary judgment, the court must draw an inference in favor of Damato on this issue.

However, courts should not encourage employees to cower behind the curtain of their supervisor's illegal and curable extortion. An employer should not be expected to remedy harassment of which it has no reason to know. Employees have a right to protected right to report harassment to employers. They should do so.

The interests of the statutorily protected class are not well-served if the court accepts too readily the argument that complaints to higher echelon decisionmakers would be futile, dangerous, or exacerbating of he underlying unlawful behavior. Subjective fear of such conditions, and the resulting inactivity, better serves the interests of the alleged wrongdoers. The statutory scheme

and case law look to prompt remedial action by employers where well-founded complaints are brought to their attention. Objectively, there is no reason to expect that employers will not comply with the law.

Here, however, Damato alleges that she believed that Frith would have her fired for reporting the harassment. The dealership does not contend that Frith could not have done so. For example, the dealership does not state that Phelan was available for complaints, or that the dealership had a published policy which encouraged employees to report harassment. *See, e.g., Ellerth v. Burlington Indus.,* 912 F.Supp. 1101 (N.D.Ill.1996) (holding that employer was not liable for unreported sexual harassment by a supervisor-decisionmaker where employer had a published policy encouraging reports). Given the absence of information in this case, the court presumes Damato's belief to be reasonable.

worsened to the point that she was forced to quit. *See Goodman v. Heitman Fin. Servs.*, 894 F.Supp. 1166, 1174 (N.D.Ill.1995) (stating that a short time span between protected activity and adverse action may constitute indirect evidence of retaliatory intent for claim of retaliation.) As such, she has adequately established the third element of her retaliation claim against the dealership. Her retaliation claim against the dealership survives summary judgment. At trial, Frith may dispute, as he has, much of what Damato claims occurred.

## B. Battery

Defendants next argue, that the Illinois Human Rights Act preempts Damato's battery and hate crime claims. Damato's battery claim is based only on the touchings which occurred as part of her alleged sexual harassment (i.e., buttocks touching). Damato's allegations of national origin discrimination do not involve any touchings of Damato. Defendants argue that, because her battery claim turns on facts which are inextricably linked to her sexual harassment claim, Damato's battery claim is preempted by the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/8–111(C).

In *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273 (1994), a former employee charged that her supervisor sexually harassed her and that she was terminated after reporting the harassment. *Geise*, 203 Ill.Dec. at 455, 639 N.E.2d at 1274. The employee sued the employer, alleging in part sexual harassment as well as negligent hiring of her supervisor. *Id.*

The Illinois Supreme Court held that the trial court lacked jurisdiction over the negligence claim, as it was preempted by the IHRA. *Id.* 203 Ill.Dec. at 457–59, 639 N.E.2d at 1276–78. The IHRA states, "Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in [the IHRA]." 775 ILCS 5/8–111(C). Under the IHRA, sexual harassment is a "civil rights violation." 775 ILCS 5/2–102(D). The Illinois Supreme Court found the *Geise* employee's negligence claim to be inextricably linked to her sexual

harassment claim. *Geise*, 203 Ill.Dec. at 458, 639 N.E.2d at 1277. Because Illinois law does not otherwise provide for jurisdiction over sexual harassment civil rights claims framed as negligence claims, the Illinois Supreme Court found that the state courts did not have jurisdiction over the negligence claim. *Id.* 203 Ill.Dec. at 459, 639 N.E.2d at 1278. *See also, Schwitzenberg v. Lifeline, Ltd.*, No. 94 C 5123, 1994 WL 684984 (N.D.Ill., Dec. 6, 1994) (determining that tort of intentional infliction of emotional distress is preempted by the exclusive remedy provision of the Act); *Lemon v. Tucker*, 625 F.Supp. 1110, 1117 (N.D.Ill.1985) (holding the procedure provided by the IHRA is not an alternative to filing a private cause of action for the tort of retaliatory discharge in the context of employment discrimination, but the exclusive source of redress).

Damato argues that *Geise* should not be relied upon for the proposition that the IHRA preempts common law claims which are based on facts identical to a coordinating Title VII claim. She contends that her claims are different from those in *Geise* because battery, unlike intentional infliction of emotional distress, is not "inextricably linked" to sexual harassment.

■ The court disagrees. Where a claim for tortious battery rests on the exact same facts as a sexual harassment claim (i.e., an offensive touching of a sexual nature) the battery claim is preempted under *Geise*. *Hannigan–Haas v. Bankers Life & Cas. Co.*, No. 95 C 7408, 1996 WL 139402, at *7 (N.D.Ill., Mar. 26, 1996). "Where the elements of the tort require proof of nothing more than that proscribed by the Act, and where the tort merely furthers the same policies as the statute, the IHRA will preempt the tort action." *Bailey v. Unocal Corp.*, 700 F.Supp. 396, 404 (N.D.Ill.1988). *See also Lynam v. Foot First Podiatry Centers, P.C.*, 886 F.Supp. 1443 (N.D.Ill.1995) (refusing to dismiss battery count in Title VII case for preemption where it was unclear whether battery occurred in sexual context); *Al–Dabbagh v. Greenpeace, Inc.*, 873 F.Supp. 1105, 1115 (N.D.Ill.1994). This preemption extends to both employers and individual employees. *Schwitzenberg v. Lifeline, Ltd.*,

No. 94 C 5123, 1994 WL 684984, at *5 (N.D.Ill. Dec. 6, 1994). Damato does not contend that Frith's touchings were anything but sexual in nature. As such, the Illinois Human Rights Act preempts her claim for battery against both Defendants.

■ Alternatively, the dealership argues that Damato's battery count is preempted by the exclusive remedy provision of the Illinois Workers' Compensation Act ("IWCA"). The IWCA provides, in relevant part:

(a) No common law or statutory right to recover damages from the employer ... for injury or death sustained by any employee while engaged in the line of his duty as employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act.

820 ILCS 305/5. The IWCA is the "measure of responsibility of any employer" for injury. 820 ILCS 305/11. There are exceptions to the exclusive remedy provisions of the IWCA where injury is not accidental. An injury is not accidental if it did not arise from employment, was not received during the course of employment, or is noncompensable under the IWCA. *Small v. Chicago Health Clubs, Inc.*, 843 F.Supp. 398, 403 (N.D.Ill.1994). Also, Damato may overcome the exclusive remedy provision if the dealership itself or its alter ego intentionally inflicted, commanded, or expressly authorized the conduct leading to her injury. *Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 151 Ill.Dec. 560, 564, 564 N.E.2d 1222, 1226 (1990).

An "accident" need not be authorized by the employer. *Id.* Certainly, Damato's alleged injuries arose out of her employment and were received in the course of employment. Her supervisor acted during Damato's employment and "on the company premises and during the course of his employment." (Compl. at ¶¶ 8–10, 20.)

■ Workplace assaults and batteries are generally compensable under the IWCA, and, therefore, not actionable at common law. *Rodriguez v. Industrial Com'n.*, 95 Ill.2d 166, 68 Ill.Dec. 928, 447 N.E.2d 186 (1982). In *Rodriguez*, the aggressor in an altercation between two employees fractured his co-employee's skull while shouting epithets about the co-employee's national origin. *Id.* 68 Ill. Dec. at 931–32, 447 N.E.2d at 189–90. The court determined that, although the attack may have been motivated by the co-employee's national origin, attacks are a work hazard faced by employees which are compensable under the IWCA. *Id.* Like attacks based on national origin, attacks based on gender are a work hazard faced by employees which are compensable under the IWCA.

Damato may also overcome IWCA preemption by demonstrating that the dealership itself or its alter ego intentionally inflicted, commanded, or expressly authorized the conduct leading to her injury. *Meerbrey*, 151 Ill.Dec. at 564, 564 N.E.2d at 1226. However, Damato has not attempted to plead either of these alternative theories of liability. She alleges only that Frith was her supervisor, not that he was the alter ego of the dealership. Damato's assertion that Frith battered her while he was at work does not establish that the dealership authorized the battery. *Carlson v. Northwestern Univ.*, 65 Fair Empl.Prac. (BNA) 797, p. 13, 1994 WL 130763 (N.D.Ill.1994) (determining that allegation of supervisor acting within discretionary authority is not the equivalent of alleging that employer authorized the conduct).

When the person who intentionally injures the employee is not the employer in person nor a person who is realistically the alter ego of the corporation, but merely a foreman, supervisor or manager, both the legal and the moral reasons for permitting a common-law suit against the employer collapse, and a substantial majority of modern cases bar a damage suit against the employer.

The legal reason for permitting the common-law suit for direct assault by the employer ... is that the same person cannot commit an intentional assault and then allege it was accidental. This does not apply when the assailant and the defendant are two entirely different people. Unless the employer has commanded or expressly authorized the assault, it cannot be said to be intentional from his standpoint any more

than from the standpoint of any third person.

*Jablonski v. Multack,* 63 Ill.App.3d 908, 20 Ill.Dec. 715, 718, 380 N.E.2d 924, 927 (1st Dist.1978) (citation omitted) (refusing to hold the employer restaurant liable for the conduct of its general manager under an alter ego theory of liability).

■ Damato's unsupported assertion that "senior management knew" is insufficient to affix liability for battery upon the dealership. *See Small v. Chicago Health Clubs, Inc.,* 843 F.Supp. 398, 403 (N.D.Ill.1994). The management senior to Frith, Phelan, must have commanded or expressly authorized the offensive touching or torso contact. Phelan did not. Thus, Damato's battery claim against the dealership is also preempted by the IWCA.

## C. Hate Crime

Next, Defendants contend that the IHRA preempts Damato's claim under the Illinois Hate Crime statute ("IHC"), 720 ILCS 5/12–7.1, in addition to her battery claim. The IHC provides a private right of action to individuals harmed by hate crimes. 720 ILCS 5/12–7.1. One commits a hate crime by committing one of the enumerated criminal acts in the statute, including battery, because of another individual's gender or national origin (or other enumerated characteristics). *Id.* Like her preempted battery claim, Damato's hate crime claim is based on the same set of facts as her sexual harassment and national origin discrimination claims. Thus, as they argued regarding Damato's battery claim, Defendants argue that the IHRA preempts her hate crime claim.

True, in the past, courts have determined that the Illinois legislature intended to preempt independent actions for civil rights violations and to make the IHRA the exclusive source for redress of such violations which arise out of one's employment. *See Mein v. Masonite Corp.,* 109 Ill.2d 1, 92 Ill.Dec. 501, 504, 485 N.E.2d 312, 315 (1985). From this determination, Defendants argue that the Illinois legislature intended to preempt IHC claims arising in the employment arena.

■ However, the IHRA was enacted in 1980. The IHC was enacted in 1993. Neither the IHC nor case law addresses treatment of alleged hate crimes in the workplace. Still,

[i]t is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter. In the absence of any express repeal or amendment, the new provision is presumed in accord with the legislative policy embodied in those prior statutes.

C. Sands, *Sutherland Statutory Construction* § 51.02 (4th ed.1984). The *Geise* case, decided after enactment of the IHC, clarifies the policy embodied in the IHRA, the prior statute in the instant case. *Geise* narrows the range of legal theories under which one may proceed with a claim based on sexually harassing behavior in the workplace.

■ Damato's IHC gender claim is inextricably linked to her sexual harassment and discrimination claims. If Damato's hate crime theory were correct, every plaintiff who is touched in the course of sexual harassment would have a claim for relief under the IHC. Although case law is sparse on the topic, it is unlikely that the Illinois legislature intended to give these many plaintiffs a second bite at the apple of recovery. In light of the recent *Geise* declaration of IHRA policy by the Illinois Supreme Court, and for the same reasons that the IHRA preempts Damato's battery claim, the court finds that Damato's IHC very fact specific claim is preempted by the IHRA.

Also, Damato has not pleaded, much less demonstrated, facts amounting to a hate crime based on national origin. Damato testified in her deposition that the only physical contact between Frith and her was sexual in nature and related to her sexual harassment claim. As such, she has not even stated a claim for relief under the IHC for a hate crime based on her national origin.

## III. *Conclusion*

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied as

to Count III and granted as to Counts IV and V.

IT IS SO ORDERED.