**Alice JANSEN, Plaintiff,**

v.

**PACKAGING CORPORATION OF AMERICA, Defendant.**

**No. 94 C 478.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 21, 1995.

---

H. Candace Gorman, Chicago, IL, for plaintiff.

James Gecker, Bonita Stone, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Alice Jansen ("Jansen") brings this three-count action against her employer Packaging Corporation of America ("Packaging"). Count I asserts that Jansen was the victim of sexual discrimination by her supervisor Al Antoni ("Antoni") in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e–17 [1]), while Count II states that Packaging retaliated against her (in further violation of Title VII) after she had complained to Packaging about Antoni's conduct and Count III sets out her supplemental state law claim for intentional infliction of emotional distress.

Packaging has moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment.[2] For the

---

1. Title VII citations will take the form "Section—," referring to the Title 42 numbering rather than to Title VII's internal numbering.

2. Familiar Rule 56 principles impose on movant Packaging the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548,

reasons stated in this memorandum opinion and order, Packaging's motion is granted as to all counts and this action is dismissed in its entirety.

## Facts [3]

Packaging is a Delaware corporation with its headquarters in Evanston, Illinois (D. 12(m) ¶ 1). It manufactures paper products, corrugated boxes, aluminum and plastic containers and related products (*id.*).

On August 2, 1991 Packaging hired Jansen as the secretary for the Tooling Services department of its Wheeling manufacturing facility (*id.* ¶ 3). Jansen's responsibilities included the maintenance and filing of blueprints, maintenance of department files, data entry and typing correspondence for individuals in the department (*id.* ¶ 4). Jansen reported to Tooling Services manager Antoni (*id.* ¶ 5).

On January 19, 1993 Jansen reported to Human Resources Director Paul Migala ("Migala") that Antoni had made unwelcome sexual comments to her (*id.* ¶ 8).[4] Migala reported Jansen's allegations to Hank Weil ("Weil"), the Director of Operations at the Wheeling facility (*id.* ¶ 9) and Antoni's immediate supervisor (P. 12(n)(3)(b) ¶ 4). Both Migala and Weil met with Jansen that same day to discuss her claims of sexual harassment (D. 12(m) ¶ 10). Jansen reported the following misconduct:

1. *Before October 1991:* Between once a week and once every two weeks Antoni would ask her what she thought about "quickies" and would pat his crotch (Jan-

sen Dep. 63–64). She did not document those comments because she thought Antoni would "lay off" (*id.* 65, 451). Antoni continued to make the comments throughout Jansen's tenure at Packaging (*id.* 73).

2. *October 1991:* Antoni said for the first time that he thought Jansen and he would be great in bed and that the affair would be strictly between them (*id.* 61–62, 65; *id.* Ex. 4). Antoni made that comment in his office (*id.* 62).

3. *November 1991:* Antoni suggested that he and Jansen "get it over" (*id.* Ex. 4) and asked "why fight?", saying that "it would be great" (*id.* Ex. 4). Antoni also made those comments in his office (*id.* 67).

4. *December 1991:* Antoni interposed himself between a kneeling Jansen and a refrigerator and requested oral sex: "You are just in the perfect position—don't worry the door will hide us" (*id.* Ex. 4). Antoni and Jansen were alone in the tool room when he made that comment (*Id.* 70).

5. *Between December 1991 and March 1992:* Antoni would occasionally ask if Jansen's boyfriend was satisfying her needs—if not, Antoni suggested that he might do so (*id.* 72). Antoni said that a total of "three, four, five times" (*id.*), but Jansen did not record those occurrences in her notes (*id.* Ex. 4). Jansen suggested that Stu Bailey ("Bailey") was a witness to some of those comments (*id.* 72, 124).

6. *March 1992:* Antoni suggested that he and Jansen "do a quickie," nothing that

2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant Jansen (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

3. This District Court's General Rule ("GR") 12(m) and 12(n) respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. Both parties have complied with these rules—Packaging has filed a GR 12(m) statement (cited as "D. 12(m) ¶—"), while Jansen has filed both a GR 12(n)(3)(a) response (cited as "P. 12(n)(3)(a) ¶—") and a GR 12(n)(3)(b) statement (incorrectly labeled as a GR 12(m) submission) of addition-

al material facts not in dispute (cited as "P. 12(n)(3)(b) ¶—") Finally, Packaging has responded to Jansen's GR 12(n)(3)(b) statement. Facts asserted and adequately supported by Packaging will be credited by this Court unless controverted by Jansen (*Stewart v. McGinnis,* 5 F.3d 1031, 1034 (7th Cir.1993)). What follows is an account that draws heavily (but not entirely) from undisputed facts in the parties' GR 12 submissions. Where deposition testimony is cited or quoted, the language should be understood *not* as a finding of fact by this Court but merely as a report of what the deponent said.

4. Not all of Jansen's complaints were made orally. She recorded Antoni's claimed misconduct in her notes (Jansen Dep. 65 and Ex. 4) and gave those notes to Migala (*id.* 111).

"Vicki" [5] had done so in the past (*id.* Ex. 4). Antoni made that suggestion in his office (*id.* 71).

7. *June 1992:* Antoni walked up behind Jansen as the latter was on all fours searching for a lost pen under her desk and suggested they do a quickie as long as she was down there (*id.* Ex. 4).

8. *December 1992:* Antoni stated that Jansen "probably gave him a woody" though it is unclear to whom "him" referred (see *id.* 76 (Antoni); *id.* Ex. 4 (unclear)). Jansen said that Bailey was again present for the comment (*id.* 76, 124).

9. *January 15, 1993:* Antoni commented that he preferred Jansen in a miniskirt (*id.* Ex. 9, Jansen's Equal Employment Opportunity Commission ("EEOC") Complaint). That was the last instance of sexual harassment by Antoni (*id.* 143; *id.* Ex. 9).

Jansen also cited some instances of physical contact. Antoni would "run his finger right above [her] bra line or on [her] bra line, and he would cross the back of it" as often as "once a month, if not a little more" (*id.* 77–80, 394).

At the January 19 meeting Migala and Weil told Jansen that they would investigate her claims (P. 12(n)(3)(b) ¶ 26). About six weeks later (on March 1, 1993) Weil, Migala and Packaging's Manager of Corporate Equal Employment Opportunity Andrew Staub ("Staub") (*id.* ¶ 6) met with Jansen and told her that although they had been unable to corroborate her complaints (D. 12(m) ¶ 34), Weil had counseled Antoni about Packaging's anti-harassment policy and he had promised not to engage in any improper conduct (*id.* ¶ 35).[6] Jansen was also given a memorandum outlining Packaging's response to her complaint and was instructed that she should inform management if the problems persisted (*id.* ¶¶ 36–37). One of the Packaging people did tell Jansen at the March 1 meeting that the investigation had uncovered some minor suggestions of behavior by *her*

that was not in line with Packaging's sexual harassment policy (P. 12(n)(3)(b) ¶ 103). But an added indication of Packaging's response came when, either at the time of Jansen's initial complaint or not long thereafter, Packaging offered her the opportunity to take an open secretary position at the Northbrook office (and thus away from Antoni) that would have resulted in an *increase* in her pay (D. 12(m) ¶ 32).

Less than a week before the March 1 meeting (on February 26, 1993) Jansen had filed a charge of discrimination with EEOC alleging sex discrimination and retaliation (D. 12(m) ¶ 60). Jansen then requested and was granted a leave of absence from March 18, 1993 through May 17, 1993 (*id.* ¶ 49). On May 6, 1993 Packaging terminated Antoni's employment (*id.* ¶ 48), stating the reason as "conflicts of interest" (*id.*).

On November 29, 1993 EEOC issued a Notice of Right to Sue. Jansen then filed this lawsuit on January 26, 1994, while she was on her third medical leave from Packaging (P. 12(n)(3)(b) ¶ 125).

*Sexual Harassment*

 Title VII's prohibition against sex discrimination includes a ban on sexual harassment (*Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986)). Sex discrimination of that type occurs either (1) where specific benefits of employment are conditioned on sexual demands ("quid pro quo theory") (*Meritor, id.* at 65, 106 S.Ct. at 2405; *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir.1990)) or (2) where an employer's conduct creates a work environment that is hostile or abusive to women ("hostile work environment theory") (*Harris,* —— U.S. at ——, 114 S.Ct. at 370). Though Jansen claims that she was a victim of *both* forms of discrimination, neither claimed ap-

---

5. There are two women named Vicki referred to in the record: Vicki Hayes (see Jansen Dep. 149) and Victoria Kempton Wiley ("V. Wiley") (see *id.* 146). It is unclear to whom Antoni was referring.

6. On the same March 1 date Packaging issued a memorandum to Antoni informing him that Packaging would not tolerate sexual harassment of any of its employees and threatening discipline of anyone found to have engaged in sexual harassment (D. 12(m) ¶ 33, Ex. C).

proach survives Packaging's motion for summary judgment.

## Quid Pro Quo Theory

■ In substantive terms *Dockter*, 913 F.2d at 461, citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987) defines quid pro quo harassment this way:

> This type of sexual harassment describes situations in which submission to sexual demands is made a condition of tangible employment benefits.

As a precondition to relief based on such harassment, however, adverse job consequences must result from the employee's refusal to submit to the requested conduct (*Gary v. Long*, 59 F.3d 1391, 1395–96 (D.C.Cir.1995) and cases cited there).

■ Jansen claims that when she would ask Antoni about the status of her several-months-overdue performance review—the review upon which her raises were based—Antoni would state while patting his crotch that he hadn't forgotten about her review (P. 12(n)(3)(a) Ex. 1 ¶ 2). But Jansen *rejected* Antoni's advances (Jansen Dep. 63), and she concedes that she suffered no harm as a result of her delayed review (*id.* 449–50). Furthermore, when Jansen did finally receive her performance review she was given an "MR" rating (*id.* 446), the same as her prior evaluation (*id.* Ex. 10).[7] Jansen also received a *raise* in pay after her evaluation (Weil Dep. 92–93), though she testified that she hadn't looked to see if her paycheck had increased (Jansen Dep. 447). And Jansen was aware of the "standard rule" that salary increases were made retroactive to the proper due date of her evaluation (*id.* 447; Weil Dep. 92–93).

As *Gary*, 59 F.3d at 1396 has put it:

[I]t takes more than saber rattling alone to impose quid pro quo liability on an employer.

See also Catherine MacKinnon, *Sexual Harassment of Working Women* 32–33 (1979). Here as in *Gary* the supervisor's threats of adverse consequences were never carried out and the employee was not harmed in any tangible economic way. Jansen's claim of quid pro quo harassment must therefore fail.

## Hostile Work Environment Theory

■ To establish a hostile work environment claim, Jansen must eventually prove (though for now she need only raise a factual issue) that the conduct in question "ha[d] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment" (*Meritor*, 477 U.S. at 65, 106 S.Ct. at 2405, quoting 29 C.F.R. § 1604.11(a)(3)(1985)).[8] But Packaging essentially bypasses that issue by arguing that "[e]ven assuming that Antoni's comments were sufficiently pervasive and severe to constitute a hostile environment" (D.Mem. 1), it cannot be held liable because (1) it neither knew nor should have known about Jansen's harassment before she reported it and (2) it took appropriate remedial action once informed.

Section 2000e(b) includes in the Title VII "employer" definition not only certain "person[s] engaged in an industry affecting commerce" but also "any agent of such person[s]." Citing that language, *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408 requires that this Court "look to agency principles" to resolve issues of employer liability for harassment by supervisors, though such principles "may not be transferable in all their particulars to Title VII" (*id.*). But there is surprisingly little guidance from

---

7. Jansen conceded that the prior evaluation was neither discriminatory nor retaliatory (Jansen Dep. 199).

8. *Meritor, id.* at 67, 106 S.Ct. at 2405–06 (citations omitted) teaches:

> Of course, ... not all workplace conduct that may be described as "harassment" affects a "term, condition or privilege" of employment within the meaning of Title VII. For sexual

harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

"Isolated and innocuous incidents" do not amount to sexual harassment under Title VII (*Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 708 (7th Cir.1995)).

*Meritor* or from our own Court of Appeals on how such principles are to be applied in the present context. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431–32 (7th Cir.1995) (citations to the other Circuits' decisions omitted) recently summed up the state of the law in this Circuit:

> An employer is not strictly liable for sexual harassment of one worker by another unless, perhaps, the harassment takes the form, not here alleged, of an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to have sex with him. In such cases, a number of courts treat the supervisor *as* the employer, whether correctly or not we need not decide. (Neither the Supreme Court nor our court has had occasion to decide the question.) In all other cases, it is clear, the criterion for when an employer is liable for sexual harassment is negligence, just as under the old common law of industrial accidents.

Both *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408 and *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990) do, however, provide a starting point—the Restatement (Second) of Agency ("Restatement"). One of the cases cited in *Baskerville, Bouton v. BMW of N.Am., Inc.*, 29 F.3d 103, 106 (3d Cir.1994), sets out the relevant provisions:

> The *Restatement (Second) of Agency* § 219 provides three potential bases for holding employers liable for sexual harassment perpetrated by their employees. Section 219(1) holds employers responsible for torts committed by their employees within the scope of their employment. Two of the four reasons listed in § 219(2) for imposing liability when an employee acts outside the scope of employment could also apply. Under § 219(2)(b), masters are liable for their own negligence or recklessness; in a harassment case, this is typically negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment. Finally, under § 219(2)(d), if the servant relied upon apparent authority or was aided by the agen-

cy relationship, the master is required to answer.

See also *Hicks*, 833 F.2d at 1418. Because Restatement § 219(1) is plainly inapplicable to Antoni's alleged conduct,[9] this opinion turns to the other two possible predicates for Packaging's liability.

*Restatement § 219(2)(b)*

▮ Restatement § 219(2)(b) provides:

> A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> \* \* \* \* \* \*
>
> (b) the master was negligent or reckless.... [10]

Employer negligence in the present context occurs where an employer (1) knew or should have known about an employee's acts of harassment and (2) has failed to take appropriate remedial action (*Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 320 (7th Cir.1992)). And unlike Restatement § 219(1), Restatement § 219(2) does not insulate the employer from liability when an employee acts entirely for his or her own benefit (see Restatement §§ 219(2) cmt. (e)).

1. *"Knew or Should Have Known"*

▮ As to the requirement that Packaging "knew or should have known" of Antoni's claimed misconduct, the relevant inquiry is whether Packaging's appropriate agents were negligent in having failed to discover Jansen's assertedly hostile work environment *before* she brought it to their attention. In that respect *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir.1994), citing *Juarez*, states:

> Knowledge of the agent is imputed to the corporate principal only if the agent receives the knowledge while acting within the scope of the agent's authority and when the knowledge concerns a matter within the scope of that authority. More-

---

9. Was sexual harassment within the scope of Antoni's employment? Of course not.

10. [Footnote by the Court] This standard is occasionally mislabeled as "respondeat superior" (see *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1421–22 (7th Cir.1986)).

over, the agent must have a duty to speak with respect to the specific item of knowledge.

Jansen claims that four agents of Packaging knew about Antoni's misconduct: Mary Reedy ("Reedy"), Migala, Zirretta and Antoni himself (P. Mem. 3).

Reedy was the employee relations manager at Packaging's Wheeling facility when Tami Long ("Long")—a tool room clerk (Long Dep. 6)—complained about Antoni (then her boss) in December 1987 (Reedy Dep. 6–7, 29–35).[11] Antoni had first told Long how nice she looked (*id.* 12) and then graduated to suggesting an affair in sexually explicit terms (*id.* 13–16). Long "left it with Mary however she wanted to handle it" (*id.* 27) but asked that Reedy *not* initiate a formal investigation (*id.* 51).[12]

Packaging thus knew of Antoni's earlier harassment of Long (although as later discussed under *Appropriate Remedial Action,* Reedy's responsive actions were both appropriately remedial and effective in light of Long's request that no formal investigation be undertaken). Jansen seeks to extrapolate that finding of Packaging's knowledge of Long's complaints into a rule that Packaging somehow became strictly liable for *all* later harassment by Antoni (Reedy Dep. 29; D. 12(m) ¶ 8). But Jansen cites no authority, and certainly this Court could find none, in support of that approach.

Migala's claimed knowledge of other and earlier sexual harassment by Antoni is disputed by the parties. V. Wiley claimed that she had hinted to Migala that she was being harassed by Antoni (V. Wiley Dep. 76–77), but when pressed to reveal why Migala would have known that she was referring to sexual harassment, she stated that she had "no facts backing it up" but that "everybody knew the way [Antoni] was" (*id.* 78). As to Migala's conversation with V. Wiley on the day that the latter left Packaging, Migala recalled that V. Wiley came to him only briefly on that day and stated that she couldn't "take it anymore" (Migala Dep. 22–23). That account fits with V. Wiley's own version—while Antoni was a factor in her decision to leave (V. Wiley Dep. 14), she conceded that she never informed management about Antoni's advances before quitting (*id.* 32, 68).[13] And she informed Migala only that she was leaving "because of a personal conflict with Al Antoni" (*id.* 24), opining vaguely that another woman should not be put in "that environment" (*id.* 76).

If this Court were sitting as the trier of fact, resolving issues of credibility, it is very possible that V. Wiley's statements would be found not to establish that Packaging's management knew or should have known of a hostile work environment (see *Braun v. Dillon Cos.,* No. 94–2079–EEO, 1995 U.S. Dist. LEXIS 6117, at *24 n. 2, 1995 WL 261142 (D.Kan. Apr. 19, 1995)). On the other side of the coin, Migala did follow up on rumors of Antoni's inappropriate comments to V. Wiley by speaking with Antoni directly about Packaging's harassment policy (Migala Dep. 26–27, 62). And despite the ambiguity of V. Wiley's parting comment, Migala sought out Antoni and asked if he had caused her depar-

---

11. Courts have cited the earlier or concurrent harassment of third parties as evidence that the currently-charged harassment was sufficiently pervasive or severe to constitute a violation of Title VII (*Dockter,* 913 F.2d at 460 n. 4; *Hall v. Gus Constr. Co., Inc.,* 842 F.2d 1010, 1015 (8th Cir.1988); *Hicks,* 833 F.2d at 1416; *Jones v. Flagship Int'l,* 793 F.2d 714, 721 n. 7 (5th Cir. 1986); *Vinson v. Taylor,* 753 F.2d 141, 146 & no. 40 (D.C.Cir.1985)). Less frequently such third parties' testimony is offered to establish an employer's awareness of a hostile work environment (see *Juarez,* 957 F.2d at 320–21; *Vinson,* 753 F.2d at 146).

12. Reedy's agreement not to mount a formal investigation (see Reedy Dep. 36–38) does not of itself negate the imputation of Reedy's knowledge to Packaging (see Restatement § 268(1)(a)). In any event, Reedy felt that she "may have" informed Migala of the incident (Reedy Dep. 45–46).

13. V. Wiley did say that the Packaging personnel secretary called her in once to warn her about Antoni (V. Wiley Dep. 23). But she reported no misconduct at that time (*id.*), and she spoke to the secretary about Antoni again only on the day she left (and then only vaguely) (*id.*). Those

ture (Migala Decl. ¶ 30 [14]). Despite Antoni's negative response [15] Migala once again counseled Antoni about the firm's sexual harassment policy as a "precautionary measure" (Migala Decl. ¶ 30). But Migala's actions might be viewed as cutting *against* Jansen's claim that Migala already knew of a hostile environment—that is, as suggesting that Migala would most likely have investigated if V. Wiley's complaint had been more explicit, precisely as Migala did when V. Wiley had earlier reported harassment by another Packaging employee (see V. Wiley Dep. 98–99).[16]

Factfinding, though, is not this Court's present role. For now it not only must credit the already-described testimony but must also draw all reasonable pro-Jansen inferences from that testimony (see n. 2). And through that lens a rational jury might find that Packaging should have known that Antoni was a womanizer, prone to hit upon women employees lower down in the employment ladder. And such a finding would place the Long episode in a different perspective,

neither as isolated nor as far in the past as it would be if it were a solitary instance of earlier harassment.

■■■ To turn to Zirretta, he was a maintenance engineer, not a manager, at the time he learned of Antoni's harassment (Zirretta Dep. 5–6).[17] And while Jansen claims that the "record is unclear as to whether Zirretta held any management responsibilities as maintenance engineer" (*id.*), Jansen's counsel appeared to assume that Zirretta did not have such responsibilities when he asked (Zirretta Dep. 6):

> Prior to Al being fired did anybody in management at PCA come to talk to you about the claim?

Any knowledge that Zirretta might have had cannot be imputed to Packaging, for he neither received the knowledge while acting within the scope of his authority nor came across anything that even remotely concerned matters within the scope of that authority (see *Juarez*, 957 F.2d at 321).[18]

---

encounters seem most likely to indicate only that the personnel secretary may have been acquainted with Antoni's prior harassment of *Long.*

14. "Decl. ¶—" citations refer to declarations that were submitted along with the parties' respective GR 12 filings.

15. Antoni denied that V. Wiley had ever complained to Migala about Antoni's sexual advances (Antoni Dep. 25). Antoni also denied that Migala had discussed with him "sexual comments alleged to have been made" by Antoni to V. Wiley (*id.* 26).

16. Jansen testified to several other incidents of alleged Antoni misconduct involving Barb Godowa (Jansen Dep. 419), Karen Haller (*id.* 80–85) and Vicki Hayes (*id.* 149–50). But Jansen herself referred to some of those claimed episodes as "[j]ust a lot of hearsay from the other employees" (*id.* 410), conceded that as far as she knew Antoni's relationship with Haller was purely voluntary (*id.* 420) and admitted that she had no information as to what Antoni had said or done to Vicki Hayes (*id.* 430). Furthermore, Migala swore—and Jansen does not dispute— that no employee informed him about any such inappropriate conduct by Antoni (Migala Dep. 37) (compare *Juarez*, 957 F.2d at 320).

17. Although Jansen had originally stated otherwise, her Response to Defendant's Motion To

Strike 15 acknowledged her mistake in having done so.

18. With this opinion now having reviewed what Packaging might be viewed as having known, or perhaps what it should have known, through the knowledge of its management personnel other than Antoni himself, it is worth taking a parenthetical look at two dubious aspects of Jansen's attempt to lay responsibility at Packaging's door. Remember that Jansen's theory is that Packaging should have known that Antoni was victimizing Jansen sexually because of what Packaging knew about Antoni's prior conduct (that after all is the underlying concept of an actionable claim against an employer based on the "hostile work environment"). But this Court has not seen cases that apply that principle twice-removed— that find the employer should have known about what was happening to the plaintiff not because of what it *knew* about the predator's prior activities of a like nature as to other female employees, but rather because of what the employer "should have known" (though it did not) about those prior activities. And there is also the irony implicit in Jansen's insistence that Packaging should have known about what Antoni was doing to her, while at the same time she did *nothing* to disclose those very events for a full year and a half (all the while keeping a careful log). Despite those serious questions as to the nature of Jansen's claim in the respect now under discussion, this opinion will give her the benefit of the doubt at this point and proceed with the analysis.

Finally, this Court rejects Jansen's argument that this Court should impute knowledge of Antoni's conduct to Packaging because Antoni was himself a Packaging supervisor. To be sure, a few courts have accepted that notion (see *Spencer v. General Electric Co.*, 894 F.2d 651, 658 n. 10 (4th Cir.1990); *Cuesta v. Texas Dep't of Criminal Justice*, 805 F.Supp. 451, 458 (W.D.Tex. 1991)). But it is really unacceptable as a concept (except perhaps when applied to those in the upper echelons of management), for it imposes a kind of per se negligence standard upon employers whenever any supervisor harasses an employee. That approach is explicitly foreclosed by *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408 and *Baskerville*, 50 F.3d at 431–32 (accord, *Sims v. Brown & Root Indus. Servs., Inc.*, 889 F.Supp. 920, 929–30 (W.D.La.1995)).

In sum, although it may involve a bit of stretching, for Rule 56 purposes it may be considered that Packaging had constructive knowledge of Antoni's conduct. *Doe*, 42 F.3d at 447, adapted for present purposes, says:

> It is possible for sexual harassment to reach a level at which it can be presumed that the [employer] must have been aware that a hostile working environment existed.

In that respect it is "the pervasiveness of the harassment [ ] which gives rise to the inference of knowledge or constructive knowledge" (*Waltman v. International Paper Co.*, 875 F.2d 468, 478 (5th Cir.1989)). With the benefit of reasonable inferences, that first half of Jansen's burden may arguably be considered to have been met. It is thus necessary to turn to the second.

*2. Appropriate Remedial Action*

In terms of Jansen's required showing that Packaging failed to take appropriate remedial action to address what it knew or should have known about Antoni's predilection toward sexual harassment, *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990) (citations omitted) states:

> [The standard of employer liability] is a negligence standard that closely resembles the "fellow servant" rule, from the era when industrial accidents were governed by negligence rather than workers' compensation law. Under that Rule, as under Title VII, the employer, provided it has used due care in hiring the offending employee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action. The employer acts unreasonably either if it delays unduly or if the action it does take, however, promptly, is not reasonably likely to prevent the misconduct from recurring.

Jansen does not contend that Packaging's responses were untimely, either in her own case [19] or the others. Jansen *does* urge, however, that Packaging's responses were insufficient.

To overcome a company's showing that it took remedial measures once it learned of sexual harassment, an employee must produce evidence of a "significant shortcoming" in the employer's response (*Saxton v. AT & T Co.*, 10 F.3d 526, 535 (7th Cir.1993)). And in evaluating that response a court may consider whether the employer's efforts "were both timely and reasonably likely to prevent the conduct underlying her [that is, plaintiff's] complaint from recurring" (*id.*; *Guess*, 913 F.2d at 465). This opinion thus turns to consider whether that test was met when Packaging was confronted with the complaints of Long, of V. Wiley and—to address the question posed in the quoted language—of Jansen herself.

Unlike the employer's agent in *Juarez*, Reedy took action and resolved Long's complaint (contrast *Juarez*, 957 F.2d at 320). Though she never informed the general manager of Long's complaint (Reedy Dep. 48–49), she did meet with Antoni to investigate Long's claims informally and to counsel Antoni "without directly accusing him" (*id.* 51).

---

19. Indeed, on the same day that she reported Antoni's conduct—January 19, 1993 (D. 12(m) ¶ 8)—Packaging arranged an initial meeting for her with Migala and a follow-up meeting with Migala and Weil (Jansen Dep. 104, 144). Migala and Weil met with Antoni that same day (Migala Decl. ¶ 10; Weil Decl. ¶ 6). Migala and Weil then launched their investigation within the "next few days" (Migala Dep. 63).

Reedy discussed with Antoni the importance of treating female employees with respect and professionalism (*id.* 50–51). Reedy followed up with Long at least once (Long Dep. 56–57; Reedy Dep. 52–53). She was "met with a smile and told that things were fine" (Reedy Dep. 52; see also Long Dep. 56). That response by Packaging clearly satisfied the *Guess–Saxton* test.

It is equally plain that Migala responded appropriately when confronted with V. Wiley's ambiguous complaints about Antoni. This opinion has already detailed Migala's actions in that respect in its *"Knew or Should Have Known"* section. And particularly in light of the ambiguous nature of V. Wiley's complaint in the first instance, Migala's responsive actions were clearly sufficient under the teaching of *Baskerville,* 50 F.3d at 432 that "what is reasonable depends on the gravity of the harassment."

 As for Jansen herself, it will be recalled that it cannot be said that, until she blew the whistle on Antoni by complaining, Packaging "knew or should have known" that Antoni was hitting on her—except, that is, to the extent just discussed regarding Antoni's prior activities. And it will be recalled that the second branch of the *Guess–Saxton* inquiry as to the timeliness and reasonableness of Packaging's response, once it has been put on notice of the offending employee's conduct, focuses on whether a failure to respond appropriately has exposed the hit-upon employee to harassment or further harassment. But in this instance the investigation triggered by Jansen's complaint unquestionably put a halt to any predatory conduct on Antoni's part (Jansen Dep. 142, 145–46).

That being so, it would seem that an examination of Packaging's reaction after it learned of *Jansen*'s victimization would be conceptually irrelevant to the present analysis. Nonetheless this opinion will go on to look at that reaction, both in the interest of completeness and because it turns out to reinforce what has already been demonstrated as to Packaging's corporate responsiveness to such problems.

As to Jansen's complaint, Packaging's response was both swift and thorough. Migala promptly interviewed Sonya Marciciak ("Marciciak") (Migala Dep. 63), the only witness suggested by Jansen (Jansen Dep. 452–53). He then interviewed at least nine other employees about Jansen's claims (Migala Decl. 12–20; P. 12(n)(3)(a) ¶¶ 19–20)[20] and conferred with in-house counsel (Staub Decl. ¶¶ 3–6). On February 4, 1993 Weil met with Antoni and counselled him as to Packaging's sexual harassment policy (Weil Decl. ¶ 13). On that same day Weil (1) warned Antoni orally that sexual harassment would not be tolerated (Antoni Dep. 79; Weil Decl. ¶ 13), (2) gave Antoni a copy of Packaging's policy (Weil Decl. ¶ 13) and (3) played for Antoni an educational videotape demonstrating instances of sexual harassment and discussed the tape with Antoni (Antoni Dep. 78; Weil Decl. ¶ 13). On March 1, 1993 Packaging issued a memorandum to Antoni, informing him formally that Packaging would not tolerate sexual harassment and citing possible disciplinary measures including discharge (D. 12(m) Ex. C; Weil Decl. ¶ 14; Migala Decl. ¶ 23). Finally, it has already been mentioned that Packaging had immediately offered Jansen a better-paying job that would have removed her from further contact with Antoni (compare *Guess,* 913 F.2d at 465).

As a result of Packaging's response, Antoni promised not to engage in any improper conduct and Jansen was so informed (D. 12(m) ¶ 35). Jansen was also provided with a memorandum detailing Packaging's investigative efforts (D. 12(m) Ex. D) and was instructed to report any further harassment directly to management (D. 12(m) ¶ 36).

Thus Packaging's response was both reasonable and effective in light of the nature of Jansen's complaints. While Jansen complains that she was not advised as to the specific disciplinary steps taken as to Antoni—she was not informed about the specifics of Antoni's counseling (Jansen Dep. 132, 404), nor was she aware that he was given formal training (*id.* 132–33)—she concedes that the

---

**20.** Jansen's complaint that her own conduct was examined during the interviews conducted by management is perhaps understandable—but it is unavailing, for *Meritor,* 477 U.S. at 68, 106 S.Ct. at 2406 clearly teaches that only *unwelcome* sexual overtures are actionable.

claimed harassment came to an end. As *Saxton,* 10 F.3d at 536 states:

> No doubt, from [plaintiff's] perspective, [defendant] could have done more to remedy the adverse effects of [the supervisor's] conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment.

In sum, Packaging's reactions to the complaints of Long, V. Wiley and Jansen were clearly reasonably calculated to respond to their respective grievances. Even with the benefit of reasonable inferences, Jansen has failed to create a genuine factual issue suggesting any significant shortcoming in Packaging's response. Thus despite the fact that Jansen appears to have shouldered her burden of creating a genuine issue as to whether Packaging should have known of Antoni's misconduct, she has failed on the second precondition to a hostile-environment claim: that Packaging's response was unreasonable under the circumstances.

*Restatement § 219(2)(d)*

Restatement § 219(2)(d) imposes liability on a master for the torts of a servant committed outside the scope of employment when:

> the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

That merely capsulizes the notion that when someone at a decision-making level within a corporation abuses his or her authority by committing a wrong "in furtherance (though possibly misguided) of the employer's business," that wrong is treated as the corporation's deliberate act (see *Shager,* 913 F.2d at 405). As *Hunter,* 797 F.2d at 1422 puts it:

> Whether *his* superiors know or should have known what he did is irrelevant; it becomes relevant only where the wrong is committed by someone below the managerial level.

See also *Saxton,* 10 F.3d at 536 n. 19; *Volk v. Coler,* 845 F.2d 1422, 1436 (7th Cir.1988); Frederick Lewis & Thomas Henderson, *Employer Liability for "Hostile Work Environment" Sexual Harassment Created by Supervisors: The Search for an Appropriate Standard,* 25 U.Mem.L.Rev. 667, 710 (1995).

For present purposes, however, special emphasis is to be placed on the requirement that an agent's creation of a hostile work environment must flow from powers or opportunities granted him by his principal (see *Bouton,* 29 F.3d at 108–09 and cases cited there). It is not enough that Antoni's position allowed him to be present to harass Jansen—he must also have invoked some aspect of his apparent authority to facilitate the harassment (*Gary,* 59 F.3d at 1397; *Shager,* 913 F.2d at 404–05). *Gary,* 59 F.3d at 1397 says:

> In such cases, "liability is based upon the fact that the agent's position facilitates the consummation of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Restatement § 261 cmt. a; see also id. § 219 cmt. e (citing § 261 in discussion of § 219(2)(d)).

If it were otherwise the basic premise of employers' liability—that they must have "the practical ability to head off the injury" (*Shager,* 913 F.2d at 405)—would fail.

On the record here Jansen was quite aware of the bounds of Antoni's authority: Antoni plainly did not speak for Packaging. Despite Jansen's statement to the contrary (Jansen Decl. ¶ 3 [21]), she was necessarily aware that Antoni could not unilaterally hire his secretaries (Antoni Dep. 13; Migala Dep. 11–12, 14; see also V. Wiley Dep. 12), review their performance (Jansen Dep. Ex. 10, listing Weil as a second reviewing supervisor) or restrict their activities (Jansen Dep. 171–72; Migala Dep. 120). Indeed, Jansen Dep. 57 indicates that Antoni's post did not carry with it even the ability to fire Jansen unilaterally had he wanted to. While Antoni may have had *some* input into each of those areas, nothing suggests that his superiors acted merely as a rubber stamp on his wishes—

---

**21.** That statement cannot stand in the face of Jansen's own deposition testimony and the unquestioned limits on Antoni's authority in the respects referred to in the text.

"his cat's paw" (*Shager*, 913 F.2d at 405)—to the contrary, Migala's overruled Antoni's decision to change Jansen's payroll duties (Jansen Dep. 171–72) and management decided to delay Jansen's review in her best interests (Weil Dep. 91–92).

Jansen was also well aware that Antoni was operating outside the scope of his apparent authority in harassing her. Restatement § 166 cmt. a states the applicable standard:

> If a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability.

Indeed *Gary*, 59 F.3d at 1397 has recently sought to extend that concept to hold that an employer is not liable if it has an effective mechanism for dealing with sexual harassment and employees are aware of that mechanism—not simply because the existence of such a mechanism tends to negate negligence on the part of the employer less negligent, but rather because it removes the guise of apparent authority from the harassing supervisor (see *Bouton*, 29 F.3d at 109).

Unlike the plaintiffs in *Gary* and *Bouton*, Jansen claims that she was unaware of Packaging's formal sexual harassment policy (Jansen Dep. 45). *Gary*, 59 F.3d at 1397–98 supports the proposition that because Jansen *should* have known of the policy—it was posted on the second-floor bulletin board (Jansen Dep. 47) and both Antoni and Weil testified that it was posted on the similarly-placed first-floor bulletin board that Jansen passed every day (Antoni Dep. 34; Weil Dep. 19–21; Jansen Dep. 46)—she should be barred from pursuing her apparent authority claim. But this opinion need not pursue that line of argument or decide whether the more extreme position announced in *Gary* would be followed in this Circuit, because it was clear in any event that Jansen had "informa-

tion" (Restatement § 166 cmt. a) that Antoni's conduct was not sanctioned by Packaging. Jansen had not reported Antoni's conduct sooner because she thought he would "back off" (Jansen Dep. 451). But when she was pushed "to the limit" by Antoni she "just walked out and went to personnel" (*id.* 451–52). Jansen plainly knew that she had some recourse at Packaging, and she cannot now claim that she believed Antoni's conduct to be sanctioned by Packaging.

### Retaliation

■ Jansen claims that she suffered several forms of retaliation after she reported Antoni's harassment to management and EEOC. More specifically, Jansen says that she was subjected to (1) a requirement that she leave notes at her desk as to her location, (2) an assigned lunch break, (3) a delay in receiving her performance evaluation, (4) obstructions created to hinder the performance of her job and (5) a diminution of her responsibilities.[22] Packaging responds that Jansen suffered no *adverse* action and that whatever actions it took were justified by non-discriminatory motivations. Those arguments in combination operate to defeat Jansen's claim.

■ *Dunning v. Simmons Airlines, Inc.*, 62 F.3d 863, 871–72 (7th Cir.1995) (citations omitted) has just recapitulated the standards that govern this Court's inquiry:

> To make out a prima facie case of retaliation a plaintiff must establish that: "1) she engaged in statutorily-protected expression; 2) she suffered an adverse action by her employer; and, 3) there is a causal link between the protected expression and the adverse action." "If she makes that showing, the burden of producing a legitimate, nondiscriminatory reason for her discharge shifts" to the defendant. If the defendant produces a legitimate, nondiscriminatory reason, the plaintiff then "bears the burden of showing that [the defendant's] prof-

---

22. Jansen also now claims that she suffered retaliation when the four tires on her car were slashed and her car antenna was destroyed (Jansen Dep. 21–24, 26). But she never asserted anything of the sort in her EEOC charge (*id.* Ex. 9 at 2–3). Given the drastic differences between such alleged conduct and what Jansen *did* claim

in her EEOC charge, that omission alone would justify this Court's decision to discount those claims (see *Cheek v. Western & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir.1994)). Far more telling, however, is that Jansen also omitted any mention of such retaliation in her Complaint in this action (see Complaint ¶¶ 16–18).

fered reasons are pretextual and that its actual reason was discriminatory." The plaintiff bears the ultimate burden of persuading the trier of fact that "the employer's articulated rationale is pretextual, either by showing that a discriminatory reason more likely motivated the employer or that the employer's proffered reason is unworthy of credence." "Rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination, and ... no additional proof of discrimination is required."[23]

See also *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1459 (7th Cir.1995).

Jansen has attempted to establish a prima facie case of retaliation by Packaging. For the most part she has not really advanced a colorable showing that she suffered "adverse action" at the hands of Packaging. That characterization cannot be attached to her having been relieved of certain responsibilities such as answering Antoni's phone, entering his office or handling payroll. As for the first two of those "restrictions," they simply lessened her day-to-day contact with (and hence her potential exposure to advances from) her claimed harasser, and the last of the three was remedied by Migala when Jansen complained (Jansen Dep. 71–72). Jansen's objections to heightened scrutiny of her whereabouts and the imposition of a required lunch break might stand in somewhat better stead in prima facie terms (that is, without considering at all what Packaging has to say), though even they face the difficulty that to create a genuine issue as to Packaging's retaliatory intent Jansen must demonstrate (as she has not) the disparate treatment of similarly situated employees (*Cone v. Long-*

*mont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir.1994); *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990)). Finally, as already mentioned, Jansen admits that she suffered no harm when her review was delayed.

█ But even if it were to be assumed arguendo that Jansen had presented a prima facie case of retaliation by Packaging in some respects, her claim on that score would still lose—for she has failed utterly to address the neutral justifications that Packaging has supplied for its conduct. Appendix A provides a table that matches Jansen's contentions and Packaging's factual responses that amply meet its *Dunning* burden.[24]

█ In light of Packaging's showing as set out in Appendix A, the burden shifts back to Jansen to counter the specific reasons articulated by the Packaging in support of its actions. Jansen must show (that is, create a genuine issue of fact) "either that a discriminatory reason more likely than not motivated the employer or that the employer's explanation is incredible" (*Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1114 (7th Cir.1992), quoting *Oxman v. WLS–TV*, 846 F.2d 448, 453 (7th Cir.1988)). That showing may be made by proffering evidence (1) that the employer's stated reasons had no basis in fact, (2) that the explanation given was not the true reason or (3) that the stated reasons were insufficient to warrant the action taken (*Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994)).

Jansen attempts *none* of those things. Instead her brief in opposition to summary judgment does nothing more than repeat her attempt to set out a prima facie case. Her

**23.** [Footnote by this Court] It should be kept in mind, of course, that *Dunning* and other cases that have spoken in like terms are not to be taken literally in a case such as the present, where Rule 56 does not require the plaintiff to *prove* her case but rather to create a genuine issue of material fact. Both here and elsewhere in this opinion, this Court has always looked only to the latter (and lesser) burden, and any references to what Jansen must "prove" should be read in that more limited sense.

**24.** In addition to Jansen's claims set out in that table, Jansen has also voiced the already-mentioned complaints that she no longer answered

calls for Antoni (Jansen Dep. 173–78, 188) and that Brad Wiley or Stu Bailey would watch her closely when she left her work area to "intermingle with the hourly employees" (*id.* 180, 188). But in addition to the flaws in those contentions already described in the text, Jansen provides no corroboration of her deposition testimony that might permit the inference that she was being unfairly treated. Jansen's "self-serving deposition testimony standing alone is insufficient to demonstrate a causal link" between her report of sexual harassment and these instances of claimed retaliation (*Koelsch,* 46 F.3d at 709).

passing comment that "[t]he reasons given for the requirement were pretextual and the true motive was retaliation" (P. 12(n)(3)(b) ¶ 108) is no more than a statement of Jansen's disagreement with Packaging's position (see, e.g., Jansen Dep. 157, stating that she did not know why Antoni was locking his office). That sort of "you're another" reply is insufficient to create a general issue of material fact (see *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir.1994)).

*Intentional Infliction of Emotional Distress*

 Under circumstances somewhat similar to those in the present case, this Court recently authored an opinion for a Court of Appeals other than our own (*Ball v. Renner*, 54 F.3d 664, 669 (10th Cir.1995)) that, after upholding the dismissal of all federal claims, dismissed without prejudice a state-law claim of intentional infliction of emotional distress based on sexual harassment. *Ball* set out the authorities such as *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) and 28 U.S.C. § 1367 ("Section 1367") that point to such considerations as judicial economy, fairness, convenience and comity.

 Ultimately Section 1367(c) treats the decision on whether to exercise supplemental jurisdiction as discretionary. But where it is clear that the supplemental state-law claim can be decided in only one way, this Court can *and should* resolve it in the interest of overall judicial economy—both federal and state (*Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir.1993)). And that is the case here: Jansen's state-law claim for intentional infliction of emotional distress is effectively preempted by not one but two Illinois statutes.[25]

To understand that twofold preemption, it should again be made plain that Jansen has not created a genuine issue as to Packaging's having acted intentionally in the corporate sense to inflict such harm on Jansen. As with Jansen's other claims, the active tortfea-

sor was of course Antoni. And under the circumstances here Illinois law does not ascribe his acts to corporate employer Packaging for purposes of the intent component of the tort now under consideration.

Definitive recent precedent from the Illinois Supreme Court compels the conclusion that no jurisdiction exists for the judicial cognizance of the claim thus advanced by Jansen. *Geise v. Phoenix Co.*, 159 Ill.2d 507, 515–19, 203 Ill.Dec. 454, 457–58, 639 N.E.2d 1273, 1276–78 (1994) holds that under the Illinois Human Rights Act, 775 ILCS 5/1–101 to 5/10–103, allegations that are "inextricably linked" to the concept of sexual harassment must be construed as charging civil rights violations within the scope of that statute (*id.* 5/2–102(D) and 5/2–101(E)(3)). That being so, Illinois courts are deprived (and therefore this Court sitting in lieu of an Illinois state court is deprived) of jurisdiction over private-party damage actions flowing from such conduct (*id.* 5/8111(C)).

 Jansen herself has conceded that her claim of intentional infliction of emotional distress is linked in just such a fashion to her sexual harassment and retaliation claims (Jansen Dep. 455–56). Hence both Illinois state courts and this Court lack subject matter jurisdiction over Count III (see *Al–Dabbagh v. Greenpeace, Inc.*, 873 F.Supp. 1105, 1114–15 (N.D.Ill.1994); *Lynam v. Foot First Podiatry Ctrs., P.C.*, 886 F.Supp. 1443, 1448–49 (N.D.Ill.1995)).

 As if that were not enough, Jansen's claim would be preempted by the two exclusivity provisions of the Illinois Workers' Compensation Act ("Act"), 820 ILCS 305/1 to 305/30. Here is 820 ILCS 305/5(a):

> No common law or statutory right to recover damages from the employer ... for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any

---

**25.** That preemption makes it unnecessary to deal with Packaging's position that on the merits Jansen has not brought herself within the rigorous confines imposed on that tort by Illinois case law. Although that position clearly has substantial force, it would be inappropriate to reach the merits where (as here) jurisdiction over the claim is lacking.

employee who is covered by the provisions of this Act....

And here is *id.* 305/11:

The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsibility of any employer....

As this Court found in *Al–Dabbagh,* 873 F.Supp. at 1112, citing *Meerbrey v. Marshall Field & Co.,* 139 Ill.2d 455, 463, 151 Ill.Dec. 560, 564, 564 N.E.2d 1222, 1226 (1990) and *Richardson v. County of Cook,* 250 Ill.App.3d 544, 545–49, 190 Ill.Dec. 245, 621 N.E.2d 114, 116–18 (1st Dist.1993), Illinois courts have consistently read those provisions as barring suits against employers for injuries intentionally inflicted by one employee upon another. *Meerbrey,* 139 Ill.2d at 464, 151 Ill.Dec. at 564, 564 N.E.2d at 1226 identifies just two exceptions to that rule: (1) where an employer has expressly authorized the injurious conduct and (2) where an assailant is considered to be the employer's alter ego.

Jansen attempts to fit her complaint within the first of those exceptions. For that purpose she must identify facts from which this Court might reasonably infer that Packaging expressly authorized Antoni to harass Jansen. But simply to set that burden against the facts that this opinion has already recited at length (particularly those as to Packaging's responses when it got wind of Antoni's activities—or even the possibility of such activities) is to sound the death knell for any such contention of express authorization— see, e.g., the specific-intent-to-injure standard announced in cases such as *Bercaw v. Domino's Pizza, Inc.,* 258 Ill.App.3d 211, 214, 196 Ill.Dec. 469, 472, 630 N.E.2d 166, 169 (2d Dist.1994) and *Copass v. Illinois Power Co.,* 211 Ill.App.3d 205, 213, 155 Ill.Dec. 600, 604, 569 N.E.2d 1211, 1215 (4th Dist.1991). Jansen's Count III claim is plainly pre-empted by the Act as well.

In sum, Jansen's Count III claim is fatally flawed on two independent bases. It too must be and is dismissed.

### Conclusion

There is no genuine issue of material fact as to any of Jansen's claims, and Packaging is entitled to a judgment as a matter of law on each. Jansen has failed to support her Count I Title VII claim of sexual harassment by Packaging on either quid pro quo or hostile work environment grounds. Count II fails because Jansen has not attempted to respond (let alone succeeded in responding) to Packaging's neutral explanations for its actions. Finally, Jansen's supplemental state-law claim in Count III is effectively pre-empted by both the Illinois Worker's Compensation Act and the Illinois Human Rights Act. Accordingly this action is dismissed.[26]

### *Appendix A*

| Jansen's Complaints of "Retaliation" | Packaging's Responses |
| --- | --- |
| Notes as to Jansen's Whereabouts | Migala explained that Antoni came to him and requested permission to require that Jansen leave notes at her desk during long absences (Migala Dec. ¶ 28). Antoni requested that the notes be left because Jansen was "not at her work area for extended periods of time" (Antoni Dep. 70, 77) and he had seen her in "non-working areas" (*id.* 70, 76–77). Migala approved of the measure because he be- |

26. Packaging's "Motion to Strike Portions of Jansen's Response to Defendant's Statement of Undisputed Facts, Plaintiff's Statement of Undisputed Material Facts and the Affidavit of Alice Jansen" possesses substantial merit, particularly (though not exclusively) to the extent that it identifies Jansen's GR 12(n) denials (ordinarily asserted without supporting citations to the record) as contradicted by Jansen's own testimony or other uncontroverted evidence. But there is no need to deal with the motion's long laundry list of defects in Jansen's submission—what has been said in the opinion has sufficed to defeat Jansen's claims. Accordingly the motion is moot.

| Jansen's Complaints of "Retaliation" | Packaging's Responses |
|---|---|
| | lieved that "a manager has the right to know where his employees are" in such instances (Migala Dec. ¶ 28). |
| Antoni's Locked Office | Antoni noted that he started locking his office door during the day when he was going to be away for a few hours because he "had some money stolen out of [his] desk" (Antoni Dep. 71). |
| Payroll Responsibilities Curtailed | Jansen's payroll responsibilities were curtailed when an information leak was suspected (Antoni Dep. 72). |
| Set Lunch Time | Migala approved the setting of a firm lunch-hour for Jansen because "Jansen was the only secretary assigned to the Tool Room and it appeared necessary to insure telephone coverage for the department and was consistent with the practice of other PCA supervisors" (Migala Dec. ¶ 29). Antoni requested the measure because "[t]here was nobody around to answer phones so Alice had to be available" (Antoni ¶ 45). |
| Attendance Problems | Migala did not recall hearing Antoni complain about Jansen's attendance before approaching Antoni about Jansen's claims (Migala Dep. 116). But Antoni testified that he had discussed Jansen's attendance with her at her 1992 performance review (Antoni Dep. 61), and Jansen conceded that her attendance became a problem not long after she reported Antoni's misconduct (Jansen Dep. 21, 26). |
| Delayed Review | Weil and Staub testified that Jansen's 1993 review was delayed out of concern for impartiality in light of her complaints (Weil Dep. 91–92; Staub Dec. ¶ 8). |